Okay, Mr. Young, we'll hear from you, representing James Johnson. Yes, thank you very much, Your Honor. Your Honor, in this case, Mr. Johnson asked for two relief, two avenues, aspects of relief from the lower court. The first is the trial judge, with all due respect, made factual findings which should have been reserved for the jury in this case. And I'll speak about those in a moment. There's actually inconsistencies in his ruling that shows . . . Would you mind speaking up just a little bit? I'm sorry. Again, Mr. Johnson asked for relief in two respects. The first is that there were factual issues inherent in the Ruiz factors. And the trial judge, with all due respect, made his own factual findings which should have been reserved for the trier of fact. The second relief that we asked for is the trial judge did not allow Mr. Johnson to amend the rule 15, which he should have done under Rule 15. In regard to whether Mr. Johnson was a borrowed employee of PPI, and I believe, fast forwarding, Your Honor, through the background of the case, Mr. Johnson is from Mississippi. He interviewed and spoke with people in Houston, PPI Tech. He then was sent over to Nigeria to go work. While there, on the rig, Nigerian rebels boarded the rig. They shot him in the knee.  He was making $300,000. His entire frame of mind going into this was through Houston, Texas, essentially. And, Your Honor, I'm assuming the briefing's been read. We laid out all the emails he got when he was hired on. We laid out the PPI Tech employees. They actually held positions there. The trial court addressed all of those, which I'll speak to in a second. And with all due respect, again, to the trial court, I believe they made factual findings that they should not have made, that it should not have made.     We laid out the PPI Tech employees. They actually held positions there. And with all due respect, if there are issues of fact as to Ruiz, those should go to the jury, and that's a fundamental principle in this case. It was a consulting services agreement in this case that we think is important for three reasons. The first is the CSA actually states that PPI Tech, the Houston company we named as the employer, was to provide services and people just like Johnson to this Nigerian job. So our first observation is under the CSA, how possibly could PPI Tech in Houston have met their requirement under the CSA by providing Johnson unless they had some degree of control over him? The second reason the CSA is important is because it actually indicates that PPI Tech has profited from Johnson and the other people that they sent over there, and this is in section two under remuneration. It says PPI N, meaning the Nigerian entity, shall pay PPI, meaning PPI Tech, our defendant in this case, a fee equal to the actual employee cost as well as an additional 15%. So what section two of this CSA says is PPI Tech, we're going to pay you whatever you have to pay Johnson and similarly situated people, and we're going to give you 15% profit on that. So we now have a company in Houston, PPI Tech, making money off of Johnson who they say they don't control or have anything to do with. Section seven, the third. You know, the more important thing in your favor, it seems to me, in this case, is weren't Although they say, yes, we were PPI employees, we were acting under the hat of PPN, PPI whatever it is. Yes. I mean, trying to put on two hats. I mean, that seems to me confusing enough that it would go to a jury, I mean, to decide. I mean, this thing is really combobulated up. I mean, you've got the operator, then you've got someone providing the drilling services, then you've got somebody hiring, recruiting somebody, that turns them over to someone for recordkeeping purposes, who then turns them over to someone to do the drilling purposes. I mean, it just seems to me that, you know, whose employee this person is, is under layer after layer after layer. I mean, it's What did the district judge say that thought that he could grant summary judgment in favor of PPI in this case? What was he convinced by? I'm sorry, Your Honor. I think he made, the term he took that I do not think was appropriate, was he made a factual finding that Rankin, Thomas, and Williams were all operating exclusively as PPN employees when they were controlling Johnson. And I think Your Honor is familiar. There is no dispute. Rankin, Williams, and Thomas controlled Johnson. We don't have an issue here where they're arguing. How were they PPI employees and the employees of PPN? I agree. I agree 100%. Well, I was asking a question. I wasn't asking for an amen. I was asking for an answer. I don't know that the trial judge was consistent in his finding either. And if you indulge me, there's three parts in this decision where the trial court actually says, it certainly implies, if not directly says, that Rankin, Williams, and Thomas were PPI tech employees. And if I could very quickly get these on the record. This, to me, when I reread the decision, I thought, the trial judge himself doesn't, he's fluctuating back and forth. When he looked at the Ruiz control test, he ultimately said these were PPI N employees. But when he looked at the agreement or meeting of the minds test under Ruiz, and this is in his decision, he actually says, PSL, PPI, and PPI N all saw PPI tech as a service provider or facilitator for PPI N. So when Judge Barbier looked at the meeting of the minds, he basically said, these people over here all understood that PPI tech, excuse me, my defendant, PPI tech, was providing the services. So when the lower court went through the meeting of the mind test, it actually made a finding or a suggestion that PPI tech controlled these people. Same thing he does again, and this is page 18 of his decision, he's summarizing the relationship of the parties, the trial court is. And he says, PSL then turned to PPI tech and provided operational support. Essentially, PSL appears to have contracted out the entirety of its functions to PPI tech, while only retaining the role of actually funding the consultants. PSL is the Belize bank account, basically. So the lower court here again says, PSL has basically turned to PPI tech and said, we need labor, we need to supply these people over in Nigeria. We're going to go to you, Houston, PPI tech, to supply these people. So twice now, the lower court has said, indicated that there's some indication that PPI tech controlled these people. The third place where he does it is when the court went through the Ruiz-Fackler, who has the right to terminate, the lower court actually ruled in favor of Johnson. And in doing so, this is the critical part, the lower court says, based on these facts, it appears that some PPI tech employees had the power to terminate Johnson, and that other entities in this complex structure would only be able to tell PPI tech to fire Johnson. So this is now the third time in this decision where the lower court is essentially making a finding that PPI tech employees, in this case, they can terminate Johnson. Those PPI tech employees, Your Honor, were Williams, Thomas, and Rankin, the men who every day called and spoke to Butch Johnson while he was on that rig, told him what to do, how to do it. We submitted emails from Jack Rankin where one observation is he signs off on them as a PPI tech employee. I mean, were these PPI employees, or who at least wore the PPI hat at times, were they actually on the rig, or were they just communicating with him through emails and that sort of thing? They were communicating every day by email. They were not on the rig. They were not on the rig. The Rankin emails we sent go into a high, high level of control. It actually tells Johnson and other people how to fill out their timesheets. It tells them about some stuff that was coming in, what to do, how to do it with it. All right, now how does Johnson's status as a consultant and an employee of his corporation, his own corporation, who signed the agreement with PPI, I guess, how does that figure into this? I don't think it excludes him from being a borrowed employee of another entity. We have always alleged him to be a borrowed employee of PPI Tech, and this is under Spinks v. Chevron, basic Jones Act laws that a Jones Act employee can't have more than one employer. So in this case, perhaps PSL was his payroll employer. Perhaps Global Oil was. In our view, it does not make a difference. If those PPI Tech employees, Williams, Rankin, and Thomas, are directing them every day, telling them what to do, how to do it, giving them the orders, we think under Ruiz that control factor, it's full of factual issues that a trier of fact has to sort out. The third area, just to touch on very briefly, is the equipment. Who supplied the equipment to Johnson? The lower court took a view of the equipment as being rig-based only, and it basically said, you're on the rig, this is a transocean-owned rig, we don't believe PPI Tech in Houston provided you any equipment. I would disagree with that, Your Honor, because all these men had a ppitech.net email address. It was provided to them out of Houston. The way these men worked and the equipment they actually used was emailed to go back and forth. The other area is all of the airfare and travel arranged through PPI Tech in Houston. None of this is disputed in the record. If I were to be asked what are the tools and equipment that this man uses as a company man, he uses his email, he uses his travel to get to and from Nigeria, and the uniforms actually have PPI on them. A few points in closing, if I may. But, I mean, it seems to be a little question, or maybe not, maybe there is a major question about the fact that he was also a PPI-N employee. Was he, I mean, was he taking all of his instructions from PPI? Yes. And what association did he have with PPI-N other than through the corporate structure that ultimately that? Your Honor, I do not believe he had any, and for two reasons. If you recall the record, Kent Schwartz ran PPI-N in Nigeria. This was a man who actually had an office in Nigeria. It's referred to as Flat 2. When I asked Schwartz who runs PPI-N, he says, I do. I'm autonomous. I run the thing. I asked him, did you ever give any orders to Johnson? No, never. Did anyone out of Flat 2 give orders to Johnson? No, never. This is the man who is PPI-N for all intents. The second very important thing, PPI-N paid people. PPI-N wrote paychecks to people. It was the Nigerian nationals that PPI-N paid on that rig. When I asked Schwartz, and this is a good indication of why they did all of this, I asked Schwartz, why didn't PPI-N just pay Johnson? And he actually says, and it's in our brief, Johnson would never work for a Nigerian company. He says, we couldn't get people over here basically to work if we were paying them from a Nigerian company. They had a Nigerian company. If they had paid Johnson through the Nigerian company, I would not be standing here. I would have sat with my client and said, you understood all this. Clearly, you work for a Nigerian entity. Those are not the facts of this case. The facts of this case are Spinks v. Chevron with respect to the contractual manipulation that went on, all to the ignorance of this seaman who is hired out of Houston, interviews with Houston, speaks to Houston. He gets e-mails that actually say PPI Tech from these people on it. When he comes into my office at the outset, why would I name anyone other than PPI Tech? Very briefly, Your Honor, with the one minute I have left, setting aside the PPI Tech factual issues that we think the trial court should have left to the jury, the trial court did not allow leave to amend. And after the court recognizes again and again how— How did you propose to amend it? We wanted to—if in the event he dismissed PPI Tech, we asked for leave under Rule 19—Rule 15, excuse me, to amend. There was no trial set at this point. The record is clear. The trial had already been continued. What were you going to amend, to claim PPI N was his employer? If that was the only claim this man had, yes. And the reason—and, again, we're short on time, but about six months before all of this was done, we went to Houston and took the depositions of these people, Thomas, Rank, and Williams. That was when they put the PPI N hat on for the first time. And so my plea to the court was, for the first time, six or eight months ago, I now learn that PPI N says they have a director working in Houston, Texas. Potentially gives me jurisdiction. I don't think I need to bring them in because, recall, the trial judge originally addressed all of this and said, You're right, Tim, there are issues of fact here as to PPI Tech. I won the summary judgment at the outset of this case. So defense counsel—excuse me, appellee may argue, Why didn't you just bring them in? Why would I have brought them in? The trial court had already told me a year and a half before this there were factual issues. This happened on the—this happened basically months, probably seven or eight months after we took those depositions in Houston. There was no reason for me to bring PPI in at that point. Okay. I think you've made your point. Thank you. I mean, I didn't—if you've got something else you were going to say, I mean, I'd give you a second to say it, but I think you've said it all. I appreciate that, Your Honor. The only thing I would ask is for—I don't believe the CSA consulting services agreement has ever been properly addressed by PPI Tech. Clearly, PPI Tech had some control under that, and they've never addressed that. Okay, Mr. Young, you saved some time for rebuttal. Mr. Marks, representing PPI Tech, you'll straighten all this out for us, I'm sure. I hope so, Your Honor. Thank you very much. Your Honor, may I please record my name is Kevin Marks, and I represent the appellee in this case, and that is PPI Technology Services, LP, or PPI Tech. Your Honor, to begin with, Mr. Young's suggestion that there was somehow a reversal at the trial court level, that there was a summary judgment granted in his client's favor and then subsequently reversed, is a little bit inaccurate. What happened was when Judge Vance initially had this case pre-answered, we filed 12B, six motions. We filed motions for form nonconvenience. I mean, you can't fault a man for having a mental sunrise, can you? No, Your Honor. But in point of fact, when Judge Vance allowed the case to proceed and said, Mr. Marks, you will answer on behalf of your clients, that was specifically to allow discovery. And that's just what took place. Discovery took place and took place in some great detail. The record is more than 8,000 pages. We had over two years to . . . I mean, how would it have prejudiced you if it had been an amendment? Is that what we're talking about? No, Your Honor. Are we talking about the issue of whether Judge Vance was bound by, or whether Judge Barbier was bound by Judge Vance, or what are we talking about? No, Your Honor. Simply that Judge Barbier took a look at this record when it was full. When Judge Vance first said . . . I understand, but that's what we're talking about. But, I mean, is the issue we're talking about whether Judge Barbier had the authority to overrule Judge Vance? What is the point you're trying to make here? My point is that Judge Barbier simply had the benefit of a full record. Okay, okay. And let's look at what . . . That's not a major issue, is it? It is not, Your Honor. But what's important to note is that the record was fully established, and a multitude of undisputed facts were fully established. Mr. Young referred multiple times to Mr. Rankin, Mr. Williams . . . Well, he says the first time this happened, though, was whenever he went to Houston to take somebody's deposition, and all of a sudden y'all began to talk the PPIN language. These were depositions conducted over two years, and it's undisputed that those three individuals were not PPI tech employees. In fact, the record is very clear on that. It's cited in our brief, footnote 27, page 5, where we cite specifically to the record. What we have here, Your Honor, are some very, very specific facts which were developed over time, and they're unassailable. The first is that Mr. Johnson initially signed a consulting agreement with PSL. Less than a week later, he signed . . . Now, he didn't sign it. I mean, it's Johnson, did he? I thought he signed it acting as . . . I mean, that he was a corporate . . . He first signed it himself, and then you're absolutely right, Judge, but that's significant because he's a sophisticated business entity in his own right. A week later, this gentleman has spent 30 years in the international oil patch. He has his own limited liability company. A week later, for the same extensive . . . I mean, does that matter? It does, Judge, because there's a linear aspect to this. We have Mr. Johnson, insulated by his own LLC, which is Global Oil, who then signs a consulting agreement with PSL, who pays . . . Well, are you contending that he's not an employee, he's not anybody's board employee, and he's just a corporate . . . I mean, a consultant who's signed a corporate agreement with whom? He signed . . . he has his own PSL. Right. His own LLC with Global Oil, who signs a consulting agreement with PSL. With whom? With PSL, a Belizean entity. PSL. Yes. Okay. A Belizean entity then contracts and sends him to . . . And PSL is just . . . it's a piece of paper in a drawer somewhere. Is that right? Well, no, Judge. It's actually a legal corporation, which is properly registered . . . I understand, but I mean, does it have employees? It has consultants. It doesn't have any employees. It has consultants and it has officers and Belizeans, yes. Okay. And it pays not just Mr. Johnson, but a multitude of consultants, some of them like Mr. Johnson, through their own sophisticated . . . It pays them. Now, it contracts with somebody to pay the consultants that it has engaged. I mean, how does it not have any employees or anything else? It has consultants. That's how it's structured. Okay. And it has officers and Belizeans. I mean, all of this is like . . . I mean, I was just looking at this. It's like AFRIN is the operator. AFRIN is the operator. And then you have PPIN, which is a Nigerian company who actually, I guess, does the day-to-day control of the laborers. If I may lay it out for you, Judge, yes. It's a very linear relationship. You start with Mr. Johnson, you go to his LLC, you go to PSL, you go to PPI Nigeria or PPIN, and then you go to AFRIN, who's the operator. PPIN, AFRIN, those are Nigerian corporations, and that's because Nigerian law requires them to be Nigerian corporations. And so, AFRIN is the actual operator who's seeking to recover mineral resources from . . . It seems to be incriminating statements that have been referred to us, and maybe they're picked out of context. I don't know. I think they are. Again, Judge, I really would like to stick to what are the undisputed facts because that's what Judge Barbier properly relied upon in terms of the undisputed facts. The undisputed facts are that linear relationship between those parties. And if you'll notice, conspicuously absent from those parties was my client, PPI Tech, the Houston Corporation. PPI Tech had a consulting agreement with two of these entities, PSL and PPIN, but it was to provide logistical support administrative services. Things like . . . PPI? PPI Tech, my client. What my client did was it helped people with visas. It helped people get airfare. It actually was a recruiter. And if you look to the Baker decision, it's a very, very similar circumstance that this court decided in Baker where the Raymond International, the parent company, if you will, that recruited initially Mr. Baker, ultimately was not his employer. And this circuit, this court decided that for a lot of reasons which are very similar to Mr. Johnson's case. So what we have here is that linear relationship with an absolute absence of PPI Tech, my client. My client did not contract with Mr. Johnson. My client did not pay Mr. Johnson. My client did not own or operate the rig. It did not control the rig. It did not provide any . . . But did he control . . . did your client control the day-to-day operation of what Mr. Johnson did? Absolutely unequivocally not. Okay. Well, what were all these emails back and forth between them then if it was not instructing him what to do and how to do his job? Well, those emails are part of the crux of Mr. Young's argument that Mr. Johnson has some sort of employment relationship with PPI Tech because of an erroneous subjective belief on the part of his client that PPI Tech is his employer. The crux of this, Your Honor, is Mr. Johnson's unfounded assertion and belief that Mr. Galen Williams, Mr. Ron Thomas, and Mr. Jack Rankin were PPI Tech employees. And they were. With all due respect, Your Honor, they were not. Never. Unequivocal on the record, they were not PPI Tech employees. In other words, they were never PPI Tech employees. They were always PPIN employees. Mr. Johnson . . . I thought you said that they wore the hat sometime one way and they wore the hat sometime the other because one of them, as I understand it, was the vice president of PPI. And you're saying he was never an employee of PPI although he was executive vice president or whatever it was. That is correct, Judge. Well, you know, wait a minute. This is getting too confusing for . . . Well, please afford me an effort to explain because these are, again, these are undisputed facts in the record. Mr. Johnson testified unequivocally he had no idea as to the contractual relationships between any of these entities and he did not know the contractual relationships as related to PPIN and PPI Tech. Again, his subjective belief, what he thought, is with all due respect not controlling. What is material are the undisputed facts. And the undisputed facts were testified to by Mr. Thomas who said, I am the AFRIN drilling advisor and I'm a director of PPIN. By Mr. Williams who is a Lagos-based AFRIN project manager and also supplied by PPN. And by Jack Rankin, excuse me, who was Mr. Williams' back-to-back and he was also an AFRIN project manager, also supplied by PPN and a PSL consultant. Those are unassailed facts. Okay, but these PPN employees who were not Nigerians themselves actually were recruited by, or many of them were, by PPI. Is that correct? And then you referred them after PPI recruited them, paid their airfare over there and got them on the job. Then you turned them over to PPL. At some point you turned them over to PPL for record-keeping purposes. And then they turned them over to PPIN. That's essentially correct, Judge. PPI is a trade name. PPI is a brand. And PPN and PSL do not have certain services that PPI tech can provide. That's why there's a consulting agreement for the administrative type services. You're right. Okay, let's look at it this way then. It seems to me, I mean, maybe that structure is good enough to insulate you from the employer relationship. But what it seems to me is that there were these constant emails before them, and that's what I seem to be focusing on, and maybe erroneously. Well, let's talk about those emails. There's no doubt, Judge Dolley, that Mr. Rankin and Mr. Thomas and Mr. Williams, they all were involved in this project. All of these individuals, ultimately the operator, the shell, if you will, the exon, if you will, if you're in this part of the world, was AFRIN. They were all ultimately contracted to AFRIN. Mr. Johnson himself was the AFRIN company man. He is the top dog for the operator on that rig. There's no other personnel on that rig that are any higher than me, and he is the AFRIN company man. We talk about the email. They used PPI email. They used AFRIN email. Mr. Johnson also had an AFRIN email address. So the fact that my Texas-based company supplied that logistical or technical support is not controlling this employment status. Mr. Johnson, Mr. Williams, and Mr. Rankin all did communicate with Mr. Johnson through email, but when they did so, they testified they were doing so, wearing their responsibilities as the AFRIN project manager, and doing so as this contract pertains to PPI. I mean, isn't that all a jury question? I mean, in other words, this is what you say they were doing, wearing the PPI hat at that time. He says, no, they're wearing the PPI hat, and I've got the evidence to show that they are telling me what to do, and one of them is the vice president of PPI, and you're trying to tell me the PPI is not his employer when he's the vice president of the company, and, you know, that they just put on their hats whenever it's convenient one way or the other, and that sort of thing that a jury would sort out, it seems to me. Well, Judge Childy, with all due respect, going back again to— If that's determined, I mean, that's all. What Judge Barbier did, and what he did, I believe, firmly, properly, is he looked at the undisputed facts, and the undisputed facts were what these gentlemen testified— Okay, tell me, what are the undisputed facts, one, two, three, four, that support your position to make it impossible for anybody to disagree with you, reasonably? Okay, that those three gentlemen— One, two, three, four. Number one, that those three gentlemen were not PPI tech employees. Number two, that when they were communicating, and even if we use the word controlling, directing Mr. Johnson's work, they were doing so under the PPIN umbrella because everybody was over there working on a PPIN project. Number three, they all testified unequivocally and uncontroverted that they were working for PPIN and that they were not PPI tech employees, and again, that was not rebutted in the record. And number four, if you look to Ruiz, really, there was a complete and entire absence of control with respect to PPI tech. PPI tech is an entirely different company that provides these sorts of logistical services about which we just mentioned. So what Judge Barbier did is he looked to the Ruiz factor. Number one is that control issue. For the reasons I just discussed, he concluded that PPI tech lacked the control. Number two, whose work being performed. Again, that was PPIN and Atherton's work. Number three, any agreement between the original and the borrowing employer. Again, we had no such agreement. Number four, the original employer's terminating his relationship with his employee. That didn't occur the whole entire time. Mr. Johnson had a relationship with his own LLC or his actual paying agent. I thought that was a hangup. I thought that PPI did have the authority to terminate Mr. Johnson's relationship with the project. I was on four. You've jumped ahead to number eight, which is, I believe, the right to discharge. Oh, I thought you were talking about terminating. Judge Barbier did address that and did say we would give him that one category. But, again, no one category is controlling when we look at all that. I would respectfully argue that the right to discharge remained with the PPIN individuals. Those are the three individuals that said they had the right to discharge him, and they said they had the right to discharge him while on the PPIN project. So finally, one of the most important is an obligation to pay, and it's unequivocal that PPI tech had no employment payroll relationship, had no payment, never made payment to Mr. Johnson or his own sophisticated corporation. Now you look also, Judge, Your Honors, as this court has instructed district courts to look to the venture as a whole, the McAllister decision, and Judge Barbier did that too. He addressed it. He said looking at it the whole, I conclude with these unassailable facts that there was an absence of control here and that there was no employment employee relationship. Finally, he looked at the Baker case, and Mr. Young addressed this in his brief as well, and he frankly needed to because Baker is very, very instructive in this case. Baker is frankly very close to dead on with the only exception that my client's situation is a little bit more attenuating. But Baker was a situation where Raymond International, they recruited an individual. They said come to work for us. They're an American company. They even helped with some pre-employment things such as travel and timesheets and some of the similar things we talked about in this case. But ultimately, a Raymond subsidiary in Saudi Arabia became that individual's direct employer, and this court held unequivocally because that even despite the fact that there was recruiting and some of those other steps that the Saudi entity was the direct employer because it was, number one, the payroll employer, and number two, it maintained control over the individual by being the master of the vessel and the crew in question. In our case, we're not even the master of the vessel or its crew. That's a Nigerian entity as well. So, again, we look at these facts as a whole, looking through Ruiz as Judge Garvey did, and looking at this record. This was not a situation where you had different perspectives from an actual factual situation. What you had were unassailable facts and an erroneous belief that Mr. Johnson could not separate PPI and PPI tech in his mind. But he candidly admitted, I don't know the difference between these jurors. I have no personal knowledge as to who's working for whom, and he could not rebut to his credit. He did not and could not rebut the uncontradicted evidence of the individuals who established what these entities were and who was working for whom. With respect to the suggestion that it was improper for Judge Garvey to fail to allow Mr. Johnson to amend, I respectfully disagree with that. That was an instance where after a motion for summary judgment was filed, in a paragraph at the tail end of the cert reply, Mr. Johnson said, well, gosh, if this is all going to be dismissed, you ought to let me amend to sue directly PPIN. That would have been a situation where he also, again, filed a motion to clarify slash amend post-judgment. So post-judgment, we had a statute of limitations problem. Pre-judgment, we had the law of the case in that we had a very clear deadline of May 24, 2013, where the judge had said they were not allowing the amendments to be pleaded. So the standard which your Honor should follow in that case would be an abuse of discretion, and there's no clear rule of law which Judge Garvey had violated there, so it certainly would be within his sound discretion. Again, I wish to stress to the Court that this is not a factual determination that was made by Judge Garvey. Judge Garvey applied the facts as extensive discovery developed them, used those undisputed facts, and reached the proper conclusion that an employment relationship between my client and Mr. Johnson was simply violated. I mean, do you have authority? I mean, what kind of authority do you have to support the position that, in this case, like PPI Tech and PPIN, they can switch their hats just, I've got my hat on here, I've got my hat on there, and just so fastly do that that they can determine when somebody is employed and when somebody else is employed, and then they are the ones that actually get to say whose hat I'm wearing. Your Honor, I'll concede we live in a very complicated world, and there's a need for levels of sophistication which may not have existed quite some time ago, but just simply because I'm a – we keep using these pronouns, they and them, but just because, say, an individual like Mr. Thomas or Mr. Williams may have had an ownership interest in one company does not mean that that company then should be deemed to be an employer of another entity. I understand that, except the fact that they were extremely involved in the employer-employee relationship to the extent that they were recruiting employees and that they were directing the work that was on this rig, whosever hat they were wearing. I mean it's just – With all due respect, it was not a matter of switching hats. It was a clear, linear, very well-established relationship between all of these parties, and again, undisputed facts and undisputed testimony as to the roles of these individuals with respect to the work being performed. Yeah, but I mean who was writing the checks of Mr. Howard or whoever these three individuals were? Was it PLS? Who was writing their checks? PSL? Yeah, PSL. Who was writing their checks? Mr. Rankin was a PSL consultant, similar to Mr. Johnson, so PSL paid Mr. Rankin. The other two individuals were paid by PPN and by – By PPN? Yes, and yet another corporation. So I mean these people that I'm seeing were switching hats were actually paid in part by PPN. Right. They were not PPI employees. They received no remuneration from PPI as relates to this particular job. Now, again – But were all of these people consultants as well and not employees? In this system, some – almost all of them were consultants. Was the vice president of PPI a consultant? The vice president of PPI was – A consultant of PPI or – He was a director. He was a board member or director, a shareholder of PPN, as was Mr. – Was he an employee? Was he paid by check for his work? Or did he just draw dividends? There was a separate corporation set up for officers, and he was paid through that. But he was not paid by – Is all of this developed in the record that we can read? Yes. I mean about who was paying who and how they were getting their monies and all that? Yes, John, and that's what I think is so critical, and I know that I'm well out of time. Well, I know, but it's my time in the sense that I'm trying to find out about this. But we'll read – if it's in the record, we'll read it all. We're not – and any kind of comments I've made here are subject to being reversed completely or changed, modified by virtue of the record. But anyway – It is all in the record. Okay. And, again, what we're dealing with is facts which are in the record versus an erroneous set of assumptions, which are not facts and which should not be controlling, which are set forth by Mr. Johnson. Okay. Thank you, Mr. Marks. Mr. Young, you have some time for rebuttal. Your Honor, in rebuttal, PPI Tech suggests that these are all undisputed facts, and that is absolutely not true. The term unequivocal and undisputed was used multiple times. When you're looking at whether or not they're PPI Tech employees, there's an enormous factual issue there. You have Rankin signing an email as a PPI Tech employee. There were representations just made to this Court that it's undisputed that none of these people were PPI Tech employees. That's the heart of this matter. What hat did these people have on when they were giving all these orders? The second – Yeah, but are there documents – are there documents in the record that would support Mr. Marks' position here, that they were, in fact, when they were working on this particular rig, they were PPI employees who were paid by them, that came out of their – out of PPI's budget and so on? Thomas and Rankin, I believe, or Thomas and Williams, perhaps, two of them were paid, the officers of PPI Tech, and this is also not disputed. These gentlemen absolutely held positions at PPI Tech also. There were statements made that they were only directors for PPIN. It is unequivocal that these people held vice president and president positions at PPI Tech. To answer Your Honor's question, the company PPI Tech set up basically an overfunded trust or insurance policy down in Belize that paid the executive officers. There's an entity in the record mentioned called CIMA Management. The Houston, Thomas, and it was either Williams or Rankin. I can't recall which one was an officer. The officers were all paid from this Belize – I don't want to call it a tax shelter, but they basically ran all their money through Belize for reasons that were set up for tax purposes. So PPI never ever wrote a check directly to Thomas or Williams or Rankin. And recall PPI absolutely wrote checks to all the Nigerians. This could have all been so simple if PPI in Nigeria simply wrote a check directly to Johnson and these other consultants. Who wrote Johnson's checks? They went from – PPI got the money from AFRIN. PPI then paid PPI Tech. If you remember the consulting services agreement, it says they will pay them the money plus 15%. PPI Tech then transfers the money to PSL in Belize, which then pays Johnson's LLC entity. So that's my understanding of it. We know under the contract, Your Honor, that PPI was obligated to pay PPI Tech. If you recall the remuneration, Section 2 of the contract says that PPI N is paying PPI Tech for all the work that Johnson's doing. Because they – for the recruitment fee in effect. The recruitment and, I believe, the overseeing of them because there were statements made or representations that it was undisputed that all PPI Tech did was administrative stuff like recruiting and airfare. That is absolutely not what Kent Schwartz said, and he's the man that runs PPI N. Kent Schwartz said under this contract, the labor like Johnson were provided by PPI Tech. So I get back to my whole question, which was never addressed during their argument. How can PPI Tech not have some level of control if they're contractually obligated to provide these people to the Nigerian entity? And this goes to the comments made about the linear relationship. There were representations made. Tell me about – you know, what I'm always concerned about as a judge is unintended consequences of what we do. Because a lot of times they have consequences that were adverse and far more harmful than good we could do. And so I'm very unsophisticated about these transactions that occur, so I come in here and I think you make a great argument. But yet I'm, say, screwing up the way that business is done throughout the world now. I mean, that's the problem with – I think, Your Honor, when a seaman – and this is, again, a Jones Act claim by Johnson. Johnson claims to be a seaman of PPI Tech, a borrowed employee. I think that the test for borrowed employee, if it is this inherently factual, it should go to a jury. As far as the tax benefits they may get, you asked about unintended consequences of all this. Whatever finding a jury makes as to the employer of Johnson or the borrowed employer of him, that's not going to have any consequence on their shell companies that they want to set up in Belize. It doesn't avoid PPIN. I believe the whole reason PPIN had to be set up was because they're drilling off the coast of Nigeria. And foreign countries generally are not going to let American companies come over there. So what they do is they set up a foreign company, PPIN. They hire the local people as the rig hands, which they did, and they pay them. Well, from Johnson's point of view, this whole disagreement in sorting of facts needs to be done in America in a court here where the jury sits down and says, look, this man thought it was Houston. There's a lot of evidence it was Houston. If a jury says it was Houston, it was. If a jury says it was Nigeria, sorry, Butch Johnson, it was. But what I get to, again, is the trial court, with all due respect, I think he made a lot of these findings himself. He even comments in there the only reasonable interpretation is that these three men were working for PPIN. And I just overwhelmingly don't see how that can be carried. Well, we'll try to sort through the record and see what we think and hope we don't make a mistake. Thank you very much. Thank you, Mr. Young. The court will take about a 15-minute recess. And before we take up the last case that we have on what we're doing.